[Crim. No. 2647. In Bank.—September 22, 1924.]

## THE PEOPLE, Respondent, v. WALTER YEAGER, Appellant.

[1] Criminal Law—Murder of Traffic Officer—Responsibility for —Driver of Automobile and Companion—Guilt of—Flight.—In a prosecution against a driver of an automobile and his companion for the murder of a traffic officer, whether the shooting was done by the one or by the other of said defendants would make no legal difference, where from the evidence the jury might well have concluded that both were guilty participants in the murder and that they fled to avoid the consequences.

[2] Id.—Shooting by Driver's Companion—Evidence—Motive.—In such prosecution, the evidence was sufficient as a matter of law to support the claim of the prosecution that it was the driver's companion who discharged at the officer the automatic revolver with which the shooting was done, and from the adverse verdict against the driver it must be assumed on appeal that the jury rejected his testimony as to his motive in passing the weapon to said companion.

[3] Id. — Punishment — Discretion of Jury — Appeal. — In such a prosecution, the matter of punishment is left to the sound discretion of the jury, and neither the trial court nor the court on appeal would be authorized to interfere with the solemn decision of the jury on that question.

[4] Id.—Testimony of Accomplice—Corroboration—Character of.— To corroborate an accomplice the evidence need not establish the actual commission of the offense, nor extend to every fact and detail covered by the statements of the accomplice, or to all the elements of the offense, nor prove that the accomplice has told the truth. The corroborative evidence must tend in some slight degree, at least, to implicate the defendant. While it need not be strong, more is required by way of corroboration than mere suspicion.

[5] Id.—Corroborating Evidence—When Sufficient.—It is sufficient if the corroborating evidence tends to connect the defendant with the commission of the offense, though if it stood alone it would be entitled to little weight, it not being necessary to corroborate the accomplice by direct evidence; but if the connection of the accused with the alleged crime may be inferred from the corroborating evidence in the case it is sufficient.

1. See 7 Cal. Jur. 888; 13 R. C. L. 724.
3. See 13 Cal. Jur. 743.
4. See 8 Cal. Jur. 178; 1 R. C. L. 168.

[6] ID.—DRIVER AND COMPANION ACCOMPLICES — EVIDENCE. — In such prosecution, the issue of the corroboration of the driver's testimony having been submitted to the jury, it must be taken from the conviction of the driver and his companion that the jury found defendants were accomplices of each other and therefore principals in the commission of the crime.

[7] ID.—CORROBORATION OF DRIVER'S TESTIMONY—SUFFICIENCY OF.—In such prosecution, in the light of the evidence furnished by other witnesses to the *res gestae*, and the inferences which the jury could have drawn from all the evidence in the case, and under the principles of law relating to the corroboration of the testimony given by an accomplice, the evidence given by the driver in question was sufficiently corroborated to justify the conviction of his companion of the actual killing of the officer.

[8] ID.—INTOXICATION OF COMPANION—QUESTIONS OF FACT—INTENT—FINDINGS.—In such prosecution, there having been evidence in the case from which the jury might have inferred that the driver's companion was in a state of voluntary intoxication at the time of the murder, the extent of the intoxication, and whether it precluded the companion from forming a specific intention to kill and murder the officer, which intent was a necessary element in this class of murder of the first degree, were essentially questions of fact, as the instructions given by the trial court indicated; and it must therefore be held from the implied finding of the jury that the evidence showed that said companion had sufficient mental capacity at the time to form, and that he did in fact form, such specific intent.

[9] ID. — VENUE — JURISDICTION — SECTION 1033, PENAL CODE. — The jurisdiction of the superior court with respect to the removal of criminal actions to another county for trial is special and can be exercised only in the case mentioned in section 1033 of the Penal Code.

[10] ID.—CHANGE OF VENUE—EVIDENCE.—It is not sufficient to require a court to grant a change of venue that there is some excitement in the county upon the subject of the action, or that the victim of the crime was a popular official, or that a fair and impartial jury cannot be selected from a certain portion of the county.

[11] ID.—VENUE—EVIDENCE — OPINION OF PRESS — SUBSIDING OF EXCITEMENT PRIOR TO APPLICATION FOR CHANGE.—The mere fact that the press expressed the opinion that the prisoner is guilty does not afford sufficient ground for a change of venue where it does not

---

6. See 7 Cal. Jur. 888.

8. Intoxication as defense to homicide, notes, 36 L. R. A. 470; 13 L. R. A. (N. S.) 1024; 25 L. R. A. (N. S.) 376; 52 L. R. A. (N. S.) 230. See, also, 13 Cal. Jur. 620; 13 R. C. L. 715.

10. See 7 Cal. Jur. 916; 27 R. C. L. 815.

appear that the crime has been a subject of general and universal conversation at any time, or that any serious portion of the community is hostile to him; and even where there was at any time great prejudice against the defendant, a change of venue will be denied if the excitement in the community has entirely subsided prior to the application therefor.

[12] Id.—Venue—Evidence — Ruling of Court — Appeal. — In such prosecution, in the face of the record on appeal bearing on the question of a change of venue, there is no warrant for holding that the trial court erred in deciding that the defendants could have a fair and impartial trial in the county in which they were tried.

[13] Id.—Evidence—Conspiracy.—In such prosecution, the statement of the driver of the automobile in question that he and the deceased officer were standing together while the driver's companion stood alone back of the car might have been found to be true, and yet if the jury believed that it was a part of the criminal scheme to thus engage the officer's attention, thereby giving the companion a chance to shoot the officer down, then a conspiracy was established, for the passing of a revolver by said driver to the companion with which the shooting was done would constitute an overt act.

[14] Id.—Conspiracy—Time.—The law fixes no time at which a conspiracy must have been entered into, and it does not provide that it have any particular duration. It is not necessary that two persons should meet together and enter into an explicit or formal agreement to commit the crime, or that the conspiracy should be expressed in words; if in any manner the conspirators tacitly come to a mutual understanding to commit a crime it is sufficient to constitute a conspiracy.

[15] Id.—Conspiracy—Evidence.—In such prosecution, if the defendants started out on the day of the homicide on a felonious mission to violate the law by stealing or taking life, with the determination not to submit to arrest under any circumstances, and they took with them firearms, jimmies or other tools to aid in effectuating their felonious purpose—and the evidence would justify an inference that such a design had been mutually formed and persisted in—and that as a part of such common design they caused the death of the officer, evidence of previous felonious acts on that day would be clearly admissible in proof of the conspiracy, for the common motive and intent to commit such crimes would attach to every felonious act so committed and their every act and declaration up to the culmination of the conspiracy would be provable

12.  See 27 R. C. L. 827.
14.  See 5 Cal. Jur. 497.
15.  See 13 Cal. Jur. 601; 13 R. C. L. 906.

against each; and in such circumstances it would not be necessary for the prosecution to show that the criminal enterprise in its inception had in contemplation any particular crime against property or person.

[16] ID. — ALLEGED STATEMENTS OF JUROR — HEARSAY. — Statements asserted to have been made by a juror to an outsider and repeated by the latter to an affiant, the statements in question not having been made by the juror to the affiant and the latter not having heard them made to his informant, are hearsay and inadmissible for any purpose.

[17] ID.—SEPARATION OF JURORS—DISCRETION.—In such prosecution, the action of the trial court in allowing the jury to separate between sessions of the court having been a matter of discretion, and no showing of prejudice therefrom having been made, there is no merit in the point that the court abused the discretion conferred by section 1121 of the Penal Code.

[18] ID.—SILENCE OF ACCUSED—ACCUSATORY STATEMENTS—ADMISSION OF.—The admission of evidence of conduct on the part of one defendant in remaining silent while present at the making of extrajudicial statements by his codefendant imputing to the former the killing of an officer and other incriminatory acts and declarations, is justified as an exception to the hearsay rule.

[19] ID.—EVIDENCE OF CONDUCT—WHEN ADMISSIBLE.—Evidence of conduct is receivable if it tends to show a consciousness of guilt or intent—such as flight, concealment, preparation, or other acts or declarations inconsistent with the theory of innocence, such evidence not being admissible for the purpose of proving the truth of the accusatory statements, but rather as indicating a consciousness of guilt on the part of the accused by allowing an imputation opposed to the presumption of innocence to pass unchallenged.

[20] ID.—ACCUSATORY STATEMENTS—PROVINCE OF COURT AND JURY.— It is for the court in the first instance to determine whether the import of the accusatory statements is such that it would furnish a foundation for proof of conduct, and it is then for the jury to decide whether the accused was aware the statements were made, whether, under all the circumstances shown, they called for a disclaimer, whether the accused did reply to them, and whether if

---

16. See 8 Cal. Jur. 434; 10 Cal. Jur. 1033; 10 R. C. L. 958.

17. Presumption of prejudice from improper separation of jury, notes, 1 Ann. Cas. 287; Ann. Cas. 1914A, 737; Ann. Cas. 1916A, 253. See, also, 16 R. C. L. 305.

18. Silence of accused on statement in his presence as a confession, notes, 4 Ann. Cas. 1042; 12 Ann. Cas. 875; 25 L. R. A. (N. S.) 543. See, also, 8 Cal. Jur. 103; 8 R. C. L. 192.

19. See 8 Cal. Jur. 42; 8 R. C. L. 192.

he did not do so, such failure showed criminal intent or a consciousness of guilt. If these propositions of fact are resolved in favor of the prosecution the item of conduct should be given the effect to which upon the entire case it is entitled.

[21] ID. — SEPARATE OR JOINT TRIAL — ADMISSIBILITY OF ACCUSATORY STATEMENTS.—Such accusatory statements are admissible against a defendant whether he be tried alone or jointly, provided that in the latter case they are properly limited to the defendant concerned.

[22] ID.—PRESUMPTION OF INNOCENCE—REBUTTAL—EVIDENCE.—When a person is charged with crime a presumption of innocence arises which attends the accused until it is overcome by proof of guilt to a moral certainty and beyond a reasonable doubt; in other words, the burden of establishing guilt thereby rests upon the prosecution, and any evidence, otherwise competent, which tends to rebut such presumption is admissible just as any competent evidence tending to support it is available to the accused.

[23] ID.— ACCUSATORY STATEMENTS — WHY ADMISSIBLE. — Accusatory statements are admissible because, if not denied, the failure to deny them is inconsistent with and tends to rebut the presumption of innocence; but unless the statements tend to negative the presumption of innocence they are not to be received against the accused, for the denial of an accusatory statement would tend to support the presumption of innocence and is not therefore admissible, since such a denial is embraced in the plea of not guilty.

[24] ID. — SEPARATE OR JOINT TRIAL — DETERMINATION BY COURT — POWER OF LEGISLATURE.—It is within the province of the legislature to vest the trial court with authority to decide whether there shall be a separate or a joint trial of defendants jointly charged.

[25] ID.—JOINT TRIAL—DEFENDANTS AS WITNESSES.—There is no provision of law or authority in this state that on a joint trial a codefendant is not a competent witness for himself or for his codefendant. He may become an involuntary witness for the people under section 1099 of the Penal Code or for his codefendant under section 1100 of said code.

[26] ID.—COMPETENCY OF DEFENDANTS AS WITNESSES.—In such prosecution, the driver of the automobile in question was a competent witness, if he elected to testify, either for himself, for his codefendant, or for the prosecution, but neither defendant could be compelled to be a witness for the prosecution or for his codefendant unless the provisions of sections 1099 and 1100 of the Penal Code were put in force.

22.   See 8 Cal. Jur. 23; 8 R. C. L. 173.

24.   See 8 R. C. L. 167.

26.   See 8 Cal. Jur. 173; 1 R. C. L. 162.

[27] ID.—NEW TRIAL—CONTINUANCE—NEWLY DISCOVERED EVIDENCE—
DISCRETION—APPEAL.—The question of granting a defendant's ap-
plication for additional time to supplement his showing on a
motion for new trial by additional affidavits and oral examination
and the question of the sufficiency of newly discovered evidence
are addressed to the legal judgment and sound discretion of the
trial court, and in this prosecution no reason is perceived for dis-
turbing the order denying the motion for a new trial.

(1) 29 C. J., p. 1063, sec. 30.    (2) 17 C. J., p. 226, sec. 3571 (1926
Anno.); 30 C. J., p. 296, sec. 540.    (3) 30 C. J., p. 455, sec. 725.
(4) 16 C. J., pp. 701, 704, secs. 1434, 1438.    (5) 16 C. J., pp. 701,
705, secs. 1433, 1439.    (6) 17 C. J., p. 226, sec. 3571 (1926 Anno.).
(7) 16 C. J., p. 712, sec. 1458.    (8) 17 C. J., p. 226, sec. 3571 (1926
Anno.); 30 C. J., p. 333, sec. 585.    (9) 16 C. J., p. 202, sec. 302 (1926
Anno.).    (10) 16 C. J., pp. 205, 206, 207, secs. 307, 308, 309 (1926
Anno.).    (11) 16 C. J., pp. 205, 206, secs. 308, 309.    (12) 16 C. J.,
p. 205, sec. 307.    (13) 12 C. J., p. 551, sec. 14.    (14) 12 C. J., p. 549,
sec. 12 (1926 Anno.).    (15) 30 C. J., p. 195, sec. 423.    (16) 16 C. J.,
p. 1226, sec. 2744.    (17) 16 C. J., p. 1076, sec. 2527.    (18) 16 C. J.,
p. 631, sec. 1256.    (19) 16 C. J., p. 549, sec. 1057.    (20) 16 C. J.,
pp. 632, 633, secs. 1257, 1258.    (21) 16 C. J., p. 852, sec. 2154.
(22) 16 C. J., pp. 534, 536, secs. 1006, 1008.    (23) 16 C. J., p. 632,
sec. 1258.    (24) 16 C. J., p. 784, sec. 2006.    (25) 40 Cyc., p. 2260
(1926 Anno.).    (26) 40 Cyc., p. 2260 (1926 Anno.).    (27) 16 C. J.,
p. 1245, sec. 2757½.

APPEAL from a judgment of the Superior Court of
Madera County and from an order denying a new trial.
Stanley Murray, Judge.  Affirmed.

The facts are stated in the opinion of the court.

A. P. Harris for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones,
Deputy Attorney-General, for Respondent.

LAWLOR, J.—On the afternoon of November 10, 1923,
near the town of Berenda, in Madera County, on the state
highway, while Clarence Pickett, a traffic officer, was en-
gaged in the performance of his duties, two shots from a
.45 automatic revolver were fired into his body without
provocation or justification and from the effects of one of

27. See 8 Cal. Jur. 427; 20 R. C. L. 289.

which he shortly expired. The defendants herein, Walter Yeager and H. B. Terry, were present when the shooting occurred and they were jointly charged by the information of the district attorney of Madera County with having killed and murdered the traffic officer. When arraigned the defendants separately pleaded not guilty and the court ruled that they be jointly tried upon the said charge after it had denied a motion for severance on behalf of Walter Yeager. The jury found the defendants guilty of murder in the first degree, the verdicts carrying the death penalty for Walter Yeager and life imprisonment for H. B. Terry.

Upon being arraigned for judgment, separate motions for a new trial were interposed and denied. Judgments decreeing the said penalties were pronounced and the defendant Walter Yeager has appealed to this court from the judgment rendered against him and from the order denying his motion for a new trial. H. B. Terry did not appeal.

According to the evidence the movements of the defendants were traced from about 8 o'clock on the morning of that day until the officer met his death. They traveled along the San Joaquin Valley in a Dodge coupe, which Terry was driving. About 4 P. M. the officer caught sight of the machine going at a rapid rate of speed and observed that it narrowly escaped collision with another car. He followed the coupe on his Henderson motorcycle for some distance, and, catching up with it, directed Terry to stop the car, which was accordingly done. In the machine with the defendants at the time were two youths from Chicago, Louis Feldman and Sam Lambert, who, upon the invitation of appellant, accepted a ride while the car was standing at an oil station near the town of Chowchilla. When the coupe came to a stop Terry was sitting on the extreme left, appellant was next to him, and then Feldman, with Lambert on his lap. The officer questioned Terry principally and searched the car, revealing several weapons, including a .32 W. C. F. revolver, which he took from the seat and placed in the pocket of his coat, two bottles of wine and some material which Terry represented was used on a hunting trip.

In the course of the conversation the officer declared Terry was in no condition to drive a machine and that he would take them into custody, having refused to accede

to Terry's request to issue a citation. He dismissed the
two youths and they started in the direction of Madera.
They had only gone about twenty feet when they heard
three shots, and upon returning to the officer found he was
wounded. Terry removed two revolvers from the officer's
coat; he and appellant hurriedly entered the machine,
taking the same positions as before, and drove rapidly away.
The stricken officer was removed to a sanitarium in Madera,
where he died. A posse started in pursuit of the fleeing
defendants and late that night they were captured on the
Dixieland road, a distance of eleven or twelve miles from
Merced. Appellant, preceding his actual capture, received
a wound in the back, evidently from a rifle ball.

It appears that after Feldman and Lambert boarded the
car, upon appellant's request Lambert handed him the .32
revolver, which was in the flap or pocket of the coupe, and
that the automatic .45, with which the shooting was done,
had been stolen by Terry that morning in Madera. While
the officer was engaged in searching the machine Terry took
the .45 automatic from the seat in the car and put it in
his pocket. He later passed it to appellant. Other facts
and circumstances leading up to, attending, and following
the killing will appear somewhat in detail in the review of
the evidence by way of furnishing a background for a dis-
cussion of the points urged for reversal.

1. It is contended "that the verdict and judgment finding
Walter Yeager guilty of murder in the first degree is a plain
and clear miscarriage of justice."

We will consider under this head three questions: (a) The
sufficiency of the evidence to establish the guilt of appellant;
(b) If he did the killing, was Terry an accomplice therein,
and, if so, was his testimony sufficiently corroborated?
And (c) was appellant so much under the influence of
liquor that a case of murder in the first degree would not
lie against him, even if it were proved he fired the shots?

(a) It is earnestly argued on behalf of appellant that
there was no evidence to sustain the claim that he fired the
Colt's automatic .45, one of the shots from which, according
to the autopsy, caused the death of the officer, but that the
evidence pointed to Terry alone as the slayer. Terry ad-
mitted that the automatic .45 was stolen by him from a
second-hand store in Madera, but he has insisted throughout

that he did not fire the shots or pass the revolver to appellant in order that he might use it on the officer.

[1] It is proper to suggest at this point that in view of the evidence as to what occurred prior and subsequent to the murder, including the removal of the weapons from the person of the officer by Terry and the precipitate flight of the pair, it may not be strictly necessary to determine whether appellant or Terry fired the shots. Whether it was done by the one or by the other would make no legal difference, for from the evidence the jury might well have concluded that both were guilty participants in the murder (secs. 30 and 31, Pen. Code; 7 Cal. Jur., sec. 39, p. 888, and *People v. Bringhurst*, 192 Cal. 748 [221 Pac. 897]), and that they fled to avoid the consequences. We will, however, discuss the evidence with reference to that point.

On November 16, 1923, in the office of the sheriff, Terry made an extrajudicial statement to the district attorney of Madera County. This statement was taken down in shorthand, transcribed, and received in evidence on the trial. In addition, Terry appeared as a witness in his own behalf. Appellant also made an extrajudicial statement at the same time, but it was not offered in evidence at the trial and he did not elect to testify. However, such statement was incorporated in an affidavit of A. P. Harris, Esq., attorney for appellant, in support of the motion for a new trial. Appellant disclaimed any knowledge of the murder, as is shown by the following quotation from the statement: "Q. You would not say then you did not kill him? A. If I knew I would say, but I don't know. Mr. Bailey: Q. Terry, did you shoot that officer? Mr. Terry: No. Mr. Bailey: Terry said he did not shoot that officer. Walter Yeager: Well, I know absolutely nothing about it; you cannot prove it by me."

In addition to Terry, Louis Feldman, Sam Lambert, Mrs. Anona Jett, Joseph R. Weldy, Bert Herrington, and Pete Pistoresi gave testimony bearing on the *res gestae*.

Louis Feldman testified that while he and Sam Lambert were "flagging" passing automobiles to get a ride, and the defendants had halted at an oil station, appellant, "the elderly man," asked him if they wanted a lift. According to the witness, Terry was driving the machine at the rate of forty or more miles per hour. On the way the coupe

was stopped for repairs to the horn, and when it got started again the witness observed the traffic officer, who was riding a motorcycle, "pull up on the side of the machine." To the direction of the officer that he drive the coupe off the highway and stop the motor Terry answered "All right"; he then drove to the right side on the dirt road and stopped the car. The motorcycle was on the left-hand side of the machine, in front of it, and when the officer directed the party to alight, Terry came out on the left-hand side and the others on the right, where the officer was at the moment. In answer to the question of the officer as to the ownership of the car, Terry answered it was his. Terry was told to come to the other side of the machine, where the officer was standing at the time, and he passed to the right-hand side of the coupe and got in front of the officer at the side of appellant. The officer glanced in the coupe and took from the seat the .32 W. C. F. revolver which Lambert had previously handed to appellant and put it in the left pocket of his oilskin coat. He told Terry he was in no condition to drive the car—that it had been going forty-eight miles an hour. Terry said he "could drive a car good." The officer answered that if he could, he wanted to look in the back of the car to see what was there. Terry assented to this, and to the question of the officer, "What is all this?" answered, referring to the things pointed to by the officer, that they "just came back from a hunting trip." When the officer looked into the machine he raised up a bottle containing wine, and remarking that they must have been drinking considerably, put it on the floor of the coupe. In answer to further questions put by the officer Terry said he and appellant worked for the Shell Oil Company in Los Angeles and that he visited the oil stations and got orders for gas and oil. As we have stated, the questions of the officer were directed chiefly to Terry, although one or two of them might be said to have been addressed to both defendants.

The witness stated that appellant had been drinking, judging from the way he talked, and that considerable wine was consumed while he and Lambert were in the machine with the defendants. Becoming satisfied with Terry's explanation that the youths had been having a free ride, the officer told them to start walking, "that we might pick up

another ride''; that he was going to take the defendants to jail; and ''Terry spoke up and talked to him if he could take his number, his license number, and Mr. Pickett said, 'No, you will go to jail, you are in no condition to drive a car' ''; whereupon the boys turned around and started to walk in the direction of Madera. The witness stated ''we walked about fifteen feet and I heard the word 'stick up' and some shots were fired.'' On cross-examination he fixed the distance at about twenty feet. He said he heard two or three shots. ''Q. What did you do then? A. Well, I turned around, I noticed Mr. Terry and Mr. Yeager, they were kind of russeling like, stepping around, not very far, but right there, making a movement.'' He and Lambert then ran straight to the officer, one on each side of him, and inquired what they could do. He made no answer, ''but groaned and kind of stretched.'' The witness stated that Terry got in the coupe on the left-hand side, Yeager on the right, and that they started off very quickly in the coupe, Terry driving. As they passed the boys they nodded and smiled, but did not seem scared.

Feldman described the officer at this point in a crouching position on the highway back of the car. ''Q. Were the defendants at that time between you and the officer? A. Well, they were right in front of the officer, and they were all standing sideways towards us, we were south of them.'' The boys lifted the officer by the shoulder, and stopping an automobile driven by a woman accompanied by two children, they, with the aid of some men running from the oil station, including Pete Pistoresi, put the stricken officer in the car and he was taken to the sanitarium at Madera.

The testimony of Sam Lambert is to the effect that about 3 P. M. on the day of the homicide, near Chowchilla, he and Feldman became passengers with the defendants. He said that as the car was moving along appellant asked him to take the .32 W. C. F. revolver out of the pocket or flap on the side of the car, saying, ''Hand me that baby; I don't feel like home without it,'' and that he passed it to him. The youth also testified that the officer wore the usual traffic uniform, including a cap and star; that when the officer ordered Terry to stop the coupe he said to him, ''You know you pretty nearly killed yourself and somebody else; I think you are in no kind of a position to drive a car.''

He described their respective positions in the machine and on the highway, the discovery of some wine by the officer, as to which Terry said it was grape juice, and of the officer taking the revolver from the seat of the coupe; he also identified the oil sign which was on the car. Lambert also stated that after he and Feldman had gone about twenty feet down the road he heard the words "Stick up" and then three shots; that they returned to where the wounded officer was lying; that the defendants drove away rapidly in the coupe, waving their hands at them as indicating "so long"; that they helped the officer into the automobile and drove with him to the sanitarium.

The witness said appellant had been drinking and was drunk; that Terry was driving at the rate of fifty or fifty-five miles an hour; that no car passed during the conversation with the officer; he described the order in which they left the car on the officer's command to "get out of this car. I want to search for liquor, for some liquor," and that Terry and the officer were on the left-hand side of the machine and he, appellant, and Feldman were on the right; that he and appellant drank the wine that had been consumed—that neither Terry nor Feldman touched it; reference is made to a quart bottle of wine three-quarters full which had been finished by himself and appellant, he taking three drinks, the balance being consumed by appellant before Terry was ordered to stop the machine. There was another bottle examined by the officer and put back on the floor of the car. This had not been opened. The witness corroborated the testimony of Feldman as to the officer taking the revolver from the seat; that when the officer said, referring to material in the rear of the coupe, "What is all this stuff?" Terry replied, "Some hunting stuff" they had on a hunting trip in the Yosemite Valley, but there is a dispute in the evidence as to whether Terry did not say Mojave Desert rather than Yosemite Valley. It was brought out that when the officer and Terry went around the front of the coupe from the left to the right hand side all the parties were on the latter side; that when the officer was facing sideways to the defendants and looking north, with his right hand in the doorway of the machine, he was facing them. "Q. Well, what was he reaching with, his right hand or his left hand? A. Well, they

kind of got too close to him and he said, 'Keep back,' he said, 'I don't know you and I am going to take no chances. . . . Q. To whom? A. To both of them.''

Feldman and Lambert were asked whether they shot the officer; they answered in the negative and identified the defendants. at the Merced county jail following their capture.

In his extrajudicial statement Terry declared he had known appellant about a month before the shooting; that they were in Merced on that day; that during the conversation preceding the homicide he told the officer he had been hunting in the Mojave Desert; that when the officer was looking in the side pocket on the left-hand side of the coupe, he, to prevent the officer from finding the Colt's automatic .45 revolver, which he confessed he had stolen the same day at Merced, put it in his pocket and later he passed it to appellant without either saying a word; that he tried to induce the officer to take his name and number of the car ''and let us go and come up some other time and he said, 'No, I am going to take you boys in' ''; that the officer ''was getting something near the handle-bars . . . and getting a paper out like all traffic officers have,'' and the witness was on one side of the motorcycle, one hand on the seat and the other hand up on the handle-bars. The officer was on the opposite side of the motorcycle and appellant in the rear of the coupe—the officer and Terry facing toward Madera. According to Terry, while he and the officer were standing and talking together at the front of the motorcycle—the officer was looking for his citation-book—he heard the words coming ''in the back of the car some place—'Stick 'em up' ''; that he and the officer turned around and the latter jumped for appellant, who held the Colt's automatic .45 revolver. ''One shot was fired and went right by me''; the officer was close to appellant; ''then it was two more shots fired close together and he started to fall; I seen him start to fall and I went over and tried to catch him before he fell''; that when the officer made a lunge towards appellant the former ''kept going after him . . . closing in on him''; that ''they were pretty close,'' indicating about a foot; that appellant said, ''I shot him in the leg''; that after the shooting appellant threw the automatic .45 on the floor of the coupe and he picked it up and laid

it on the seat because it was cocked; that when he bought the cartridges for the automatic .45 appellant loaded it—he did not—and that appellant reloaded it after the shooting; that appellant had the bottle of wine when he got in the car. Concerning the witness taking two guns from the officer after the shooting, we quote: "Q. Then what, if anything, did you do? A. I took two guns out of his pocket. Q. Was there any reason for that, why did you take those guns out of his pocket? A. Because he said he was only shot in the leg and I thought he would get up and shoot as soon as we started away." The witness stated that appellant got in the car on the right-hand side and that he stepped in on the left. They started down the road, Terry driving the car as before. "Q. And what, if anything, did Mr. Yeager say to you at that time? A. He said, 'Let's go to Mexico.' Q. What did you say to him, if anything? A. I said, 'Hell, I don't want to go to Mexico. I have been there before and I know what it is down there.'" As Terry started the coupe appellant directed him to turn to the right. Some distance along the road the Shell oil sign and an extra tire were thrown from the car by appellant. They changed their clothes and drove around to Merced and then took to the highway.

In the extrajudicial statement he quoted appellant as declaring to him about two weeks before the homicide "that if any officer ever stopped him he would shoot him. . . . It would not do them any good for an officer to stop me, . . . because they won't get me, . . . whenever an officer stops me I am going to do what they do, shoot . . . any of them will shoot, and I can do the same." Asked whether when he handed the revolver to appellant he had the statement in mind he answered, "I did not, I never thought anything about that; all I had in my mind was to get rid of the gun before he [the officer] found it." Terry denied the statements of the witness Lambert that he was driving at the rate of fifty or fifty-five miles an hour when the officer appeared, and explained that the speedometer was not registering correctly. He declared that appellant had been drinking, but that he was not drunk.

On cross-examination the witness testified he bought fifty shells at Merced for the Colt's .45 automatic revolver, which were in his pocket when he handed the gun to appellant;

194 Cal.—30

that appellant is hard of hearing but is not deaf; that they were driving at the rate of forty miles per hour; that he took advantage of the officer passing around to the right side of the coupe to hand the automatic .45 to appellant; that when appellant said "Stick 'em up" he had the revolver in his hand and that when he said this the officer jumped at him. According to the witness, they both assumed until after they had been taken to Stockton that the officer was only wounded in the leg; that when they were taken into custody he did not know whether the automatic .45 was in the machine or where it was; that when he passed the automatic .45 to appellant in order that it might escape the notice of the officer, he thought appellant would hide the weapon, "or throw it away, or something"; that standing on the bare highway close to the officer he could not get rid of the weapon, but that appellant, being near the weeds, could dispose of it; that when he handed the automatic .45 to appellant he thought the officer had searched him and the two boys when the three were on the right side of the car, because appellant's coat was off and if he had a weapon in his pockets the witness would have seen it; and that at the time he did not know whether appellant had the .32 W. C. F. revolver on his person. Terry stated he was on his way back to the Mojave Desert, and for impeachment purposes he was asked if he had not told the sheriff in the county jail he was going to Fresno to hold up a street-car. His reply was "Something about that, but it was something about that, but it was before or after that, I told him we was going back down near San Bernardino where I live and that is near the Mojave Desert, that runs up to the edge of the mountains there and I live near the mountains in San Bernardino." The witness said he thought the shooting was an accident, that "it might have been because he was drinking, was what I thought"; that when the first shot was fired he was on one side of the motorcycle and the officer on the other and that the latter was between him and the appellant. "I seen the gun, but I did not see it go off"; that appellant was about twelve feet away; that there was "a little pause" after the first shot, and the succeeding shots came close together; that as the officer started toward appellant, the latter stepped back two or three steps

and that they were separated about a foot when the last two shots were fired—but "I cannot tell how close he was."

Terry declared that appellant suggested changing their clothes—he changed all of his and the witness substituted the blue pants for the corduroy pants and put on a cap. "Q. What did you change your clothes for? A. So nobody will see them, would not know it, something like that. Q. You were trying to get away? A. Yes, he said he was only shot in the leg and I thought he was only shot in the leg"; that the two guns he took from the officer were in his two leather coat pockets; that he thought the officer put the bottle of wine down in his coat; that appellant had the bottle of wine when he got in the coupe. He denied he saw him remove the bottle of wine from the officer's coat, or that he actually saw him load the automatic .45 either before or after the shooting, although as to the latter it was shown he had made contradictory statements. Terry also testified he did not wait until the last shot was fired before going up to the officer; that when they were pursued by the posse "the first shots fired hit me in the back of the neck and knocked me dizzy almost." Of appellant he said in the course of his statement: "Why doesn't he tell the truth? It would be more better for him if he would come out and tell the truth." He also said, appellant is "just putting that on"; that he has a good education. "He knows politics and things like that."

Terry, referring to the stop to "get gas when the boys joined them," said of appellant, "Well, he was pretty well lit up; yes." It may be mentioned here that Sheriff A. B. Turner, of Mariposa County, testifying concerning the capture of the defendants, said that when Terry got out of the coupe and the officers commanded appellant to come out of the car, "Terry said he was not able to; he was all in. He said Yeager was not able to get out. . . . Q. I will ask you, did he say he was shot through and he is all in? A. He first said he was all in, and then he said he was shot through. . . . He had one wound on the right side of his back. Q. Was that a bad wound? A. Well, it was a small hole, it was swollen considerable at the time." The prisoners were taken to Merced the first night, the following night to Stockton, and later to Madera.

Mrs. Anona Jett, a resident of Berenda, testified that about 4 P. M. on the day of the murder she saw the officer on his motorcycle traveling behind the coupe, which "was going very, very fast." She observed three men get off the right side of the coupe. When the coupe passed her father's place she walked out to the edge of the highway and stood there watching the officer for about three minutes, observing whether he would make an arrest; and that she walked back to the chair about twenty-five feet away where she "had been sitting on the porch." The officer was about one thousand feet distant and he talked with the defendants about three minutes. Leaning over to pick up a book she had been reading a shot was fired. Returning to the highway she heard two more shots in rapid succession and saw the officer "take at least three steps and in this time one of the defendants walked over back of the car to the right door and got in and sped away." When the last two shots were fired the officer fell to the north and as the coupe passed her she observed the Shell oil sign on it.

Pete Pistoresi, a storekeeper, who resided at Berenda, testified that on the day of the murder he observed the officer on his motorcycle chasing the coupe; that he assumed when the officer got off his motorcycle he was going to arrest the parties in the coupe, so he went into his store; later, he heard the shots, ran out on the highway and saw the officer and then jumped in a car but he could not start it; he then endeavored to run up to where the officer was lying and the coupe started to go toward Madera at a speedy gait; he continued on and helped the youths to place the officer in an automobile; and that he picked up a .45 shell, which had a mark on it, behind the motorcycle near the scene of the shooting.

Joseph R. Weldy, a farmer in Madera County, testified that as he stood in the middle of the highway, about 150 feet from Pemberton's store, on the afternoon of the killing, he saw a group of people between an eighth and a quarter of a mile down the road and heard some shots; that when he "heard the shots fired the bunch seemed to break away"; that he saw two or three men walk fast, a man "standing by himself for a few seconds and then I saw somebody— I heard an unusual noise and then I saw somebody fall across the highway"; asked whether he could determine which of

the two men did the shooting, he replied, "It looked like the taller man"; that he saw one man get in the coupe on the left-hand side, but that he did not appear to be the one who did the shooting; that the officer fell right on the highway, back of the automobile.

Bert Herrington, a feed dealer in Madera, testified he picked up an automatic .45 shell near the Pistoresi store, and that it looked as if someone had stepped on it.

Dr. Dow H. Ransome examined the body of the deceased officer and testified there was a gunshot wound located four inches to the right of the median line in the front of the chest and about two inches below the collar-bone—evidently the point of entry of the bullet; that there was another wound located about one inch to the left of the nipple on the left side of the chest about two inches below the nipple —the point of entry of the bullet which emerged from a point twelve inches below and off to the left; that he could not determine which bullet entered the body first; that both bullets ranged approximately in the same direction, which was to the left and down at an angle of about sixty degrees and also ranged downward; that the bullet which entered the right side severed the large vessels at the base of the heart and was the cause of death.

J. H. Barnett, sheriff of Madera County, in his testimony identified the .38 revolver which the deceased officer had on his person at the time of the shooting. He stated that the officer was six feet in height, appellant five feet eleven and one-half inches, and Terry five feet ten and one-half inches.

C. T. Wright, a second-hand dealer in Merced, testified that about 1:30 P. M., November 10, 1923, the defendants entered his store to purchase a gun; he showed Terry the Colt's automatic .45 and they were willing to purchase it but he "could not sell it to them unless they had a permit to buy"; that they left to go to the city marshal to get a permit. In about a half or three-quarters of an hour they returned and asked to see the gun again; they looked it over and reported "that they had not been able to get a permit yet. Mr. Harris: We ask that last be stricken out. The Court: Yes, you say 'they'; now, which one? A. Well, Terry; I am talking about Terry altogether. . . . The Witness: Terry is the man." The conversation took place in the presence of appellant. To satisfy himself the

witness left in his car to see the sheriff about selling the gun without a permit. When leaving he put the gun on a table in the presence of defendants and left his wife in the store. The defendants left the place, saying they would be back. Not succeeding in getting a permit Wright returned to the store a half hour later and found that the defendants had gone and five minutes later he discovered that the automatic .45 had disappeared. The witness also testified that the defendants endeavored to sell him a typewriter, and stated further that if they had the automatic .45, they stole it from him.

Y. V. Preciado, a barber in Madera, testified that about 8:30 on the morning of November 10, 1923, he shaved Terry and saw the .32 W. C. F. revolver in his pocket; that Terry explained he needed the gun in his business of collecting; that he was accompanied by another man but he could not swear it was appellant.

Delbert Odren, the partner of the last witness, testified that the defendants drove up to the shop that morning in a coupe which had a Shell oil sign attached to it.

Fred J. Stutz, a hardware salesman in Merced, testified that the defendants came into the store about 3:30 or 3:45 on November 10, 1923, and purchased a butt shock absorber or cushion for a twelve-gauge shotgun, three or four files, a mattress needle, chisels and little bars in stock—jimmie bars for prying, and that appellant made the selection; they left the store and later Terry came back and purchased the fifty automatic .45 shells already referred to. This witness identified the clothing worn by the defendants.

T. G. Graham, a rancher, testified that about 6 P. M. of the day of the murder he saw Terry in the coupe at the junction of the Robertson boulevard and Washington road about a mile from Chowchilla. He did not notice whether anyone else was in the car. The coupe passed him, driven fast; that he followed it for some time, and when endeavoring to pass ahead the coupe turned off the Washington road and whirled in front of his car—which tore the fender from the coupe.

R. W. Daniels, a tire and battery dealer in Merced, testified that after the capture of the defendants, he, with Virgil Gordon, Percy Cook, and a Mr. Garner, brought in the

coupe, which was located off the highway on the Dixieland road, about eleven miles distant from the county jail. It appears from this line of testimony that the party found in the car a six-shooter, a .32–.20 Colt's, loaded, and a .38 double-action six-shooter, with one empty chamber, both belonging to the deceased officer; a revolver, with five loaded shells and one empty chamber; a rifle; a Winchester sawed-off shotgun, loaded, with the hammer clear back; a handful of shells, a twelve-gauge shotgun and a "one man type-writer." In the middle of the road a short distance back of the coupe were found the Colt's automatic .45 six-shooter with one empty chamber; also the magazine. Terry denied that he knew how the weapon and magazine got on the road, and the intimation from his testimony is that appellant must have thrown them from the coupe.

It has been suggested, based on the fact that it had one empty chamber, that the first shot came from the officer's .38 special. But even if this were true, it could make no difference in the legal situation of the defendants. However, against this claim are several inconsistent elements in the testimony. For instance, Terry testified that while he and the officer were standing close together at the motor-cycle right in front of the coupe and appellant was in the rear of it, the first shot whizzed by *his, Terry's,* head. If this were true, appellant's theory that the first shot came from the officer would involve the proposition that the officer fired in the direction of Terry, who was right alongside of him. Moreover, evidence was received that the officer habitually left one chamber of his gun empty. It was probably in connection with the theory that the officer fired the first shot appellant proposed, and the court refused to give, an instruction to the effect that if the jury believed appellant killed the officer, having reasonable grounds to believe that if he did not do so the officer would do him great bodily harm, "then his act was not either murder or manslaughter, but justifiable self-defense."

[2] It is plain from the foregoing summary of the evidence that it is ample as a matter of law to support the claim of the prosecution that it was appellant who discharged the automatic revolver at the officer, and from the adverse verdict against Terry it must be assumed the jury rejected his testimony as to his motive in passing the

weapon to appellant. This conclusion as to Terry might find special support in the admitted fact that he stole the automatic .45. But whatever his complicity in the crime may have been, there is not a shadow of proof that he fired the shots. Appellant's contention to the contrary must rest on conjecture and surmise and not on the evidence in the case. The differentiation in the penalties imposed may be traced to the comparative youth of Terry, that he did not actually kill the officer, and, possibly, for the reason that the statement he made to the district attorney six days after the murder was committed might be regarded as having elements of frankness in it. There are some apparent contradictions and inconsistencies in his testimony which it was within the province of the jury to resolve, but his version of the shooting is not directly contradicted by any other witness. There is evidence of disinterested witnesses that the one who did the shooting got in the coupe on the right side; it is conceded that appellant entered on the right side and Terry on the left—the relative positions they occupied in the coupe throughout the day. Terry's testimony is supported by that of Joseph R. Weldy that the taller man did, and the man who got in the left-hand side of the car did not, appear to do the shooting. If the jury believed Terry's statement that the officer "lunged" toward appellant as "he was closing in on him," this would tend to minimize the importance of the evidence as to the powder marks, the experiments in firing through the cloth, and the downward trend of the bullets in the body, for it is not to be assumed that in advancing or lunging upon his adversary the officer would maintain a strictly perpendicular position. The quoted command to "Stick 'em up," which was heard by disinterested witnesses, was the signal for action, and no witness has declared it emanated from Terry.

The murder was one of peculiar wantonness. Evidently satisfied from what he had witnessed that the public safety and the lives of those in the machine were endangered by the reckless driving of the coupe, the officer in the performance of his duty could see no escape from taking the defendants into custody, especially after he ascertained the contents of the car. Mention is made in the testimony of his considerate manner toward the pair. Under the evidence it would seem that no verdict other than murder in the first

degree would satisfy the law. An implication arises from the verdict that the jury concluded the evidence established a deliberate and premeditated taking of human life, and, as a matter of law, they would be well within their province in so deciding. **[3]** The matter of punishment is left to the sound discretion of the jury, and neither the court below nor this court would be authorized to interfere with the solemn decision of the jury on that question. When the attention of appellant's counsel was called to the rule that on appeal all disputed questions of fact must be resolved on the side of the judgment he answered, "I think so. My only object is to show the portions not corroborated," a point we shall now proceed to consider.

(b) We will next take up the question of the corroboration of Terry's testimony. Section 1111 of the Penal Code provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

At the request of appellant the court below gave an instruction embodying the substance of the first sentence of the above section. **[4]** It has been held that to corroborate an accomplice the evidence need not establish the actual commission of the offense, nor extend to every fact and detail covered by the statements of the accomplice, or to all the elements of the offense, nor prove that the accomplice has told the truth. The corroborative evidence must tend in some slight degree, at least, to implicate the defendant. While it need not be strong, more is required by way of corroboration than mere suspicion. **[5]** It is sufficient if the corroborating evidence tends to connect the defendant with the commission of the offense, though if it stood alone it would be entitled to little weight. It is not necessary to corroborate the accomplice by direct evidence. If the connection of the accused with the alleged crime may be inferred from the corroborating evidence in the case it is sufficient. (8 Cal. Jur., sec. 256, p. 178.)

[6]    This issue was submitted to the jury, and it must be taken from the conviction of both defendants that they were found to be accomplices of each other and therefore principals in the commission of the crime. (Secs. 30 and 31, Pen. Code; 7 Cal. Jur., sec. 39, p. 888; *People* v. *Bringhurst,* 192 Cal. 748 [221 Pac. 897].)    [7]    We are of the opinion, in the light of the evidence furnished by other witnesses to the *res gestae,* which has been sufficiently outlined under point 1 (a), and the inferences which the jury could have drawn from all the evidence in the case, that under the principles stated the evidence of Terry was sufficiently corroborated to justify the conviction of appellant of the actual killing of the officer.

(c) It is next contended that "there is uncontroverted evidence that Yeager was drunk at the time of the shooting and that he had consumed a large quantity of intoxicating liquor just prior to the shooting." At the request of ap-pellant the court gave two instructions embodying the pro-visions of section 22 of the Penal Code. The prosecution proposed an elaborate instruction on the subject, but the court gave to the jury only the following portion of it: "The weight to be given to evidence of drunkenness is a matter for the jury to determine in connection with all the other evidence and circumstances in proof in the case." [8]    There is evidence in the case from which the jury might have inferred that appellant was in a state of volun-tary intoxication at the time of the murder, but the extent of the intoxication, and whether it precluded appellant from forming a specific intention to kill and murder the officer, which intent is a necessary element in this class of murder of the first degree, are essentially questions of fact, as the instructions given by the court indicated. It must there-fore be held from the implied finding of the jury that the evidence showed appellant had sufficient mental capacity at the time to form and that he did in fact form such specific intent. It was no doubt with reference to this question that the court instructed the jury as to manslaughter, for under the evidence there would seem to be no other warrant for presenting that issue for their consideration.

2. The next assignment is "Errors of Court in decisions on questions of law." We quote: "It is the contention of appellant that the trial court abused its discretion in deny-

ing the appellant's motion for a change of venue. It is conceded that this matter lies in the discretion of the trial court, but the Supreme Court has repeatedly said that this discretion is not arbitrary, 'but one the exercise of which must be reasonable.' . . . "

The showing made in support of the motion for change of venue was in the form of affidavits, newspaper clippings, and testimony. Appellant filed an affidavit of Guy D. Carter and two of A. P. Harris, the attorney for appellant. Testimony was given by Guy D. Carter, Howard A. Clark, Robert Brown, D. R. Hanhart, and Herman Crow. J. C. Arnott, Fritz Muller, L. E. Johnston, and Joe Walsh filed counter-affidavits. Joe Walsh also testified on behalf of the People.

The supporting affidavit of appellant sets forth that he was unknown in the community; that the people from whom the jury would be drawn have access to the public press, which has stated that he and Terry shot the officer in cold blood; that the press and public at large have been poisoned against him by statements that he committed a series of robberies, when, in fact, they were committed by others; that lengthy statements have been published almost daily since the homicide which have detailed the facts; that such reports have been circulated throughout the county of Madera, and that when he and Terry were arrested a large concourse of people, composed of citizens of good standing and repute, gathered in the streets of Madera; that these people threatened to lynch them; that at the entrance to the jail one of the bystanders made a violent gesture toward him and in quick undertones said "An eye for an eye," and that he heard numerous remarks such as "Throw them to the dogs" and "Lynch him"; that he was saved from mob violence by being removed from the county jail at Madera and hidden in the bottom of a large automobile and swiftly taken to the county jail of Merced, and that at said jail he and the officers in charge were met by another crowd bent on violence, and that at said place he heard cries of "Lynch them"; that the officers defeated the purpose of the mob at Merced by moving the defendants in the county jail secretly and taking them swiftly to the city of Stockton; that at numerous times he has heard of the tense feeling in the county from a sister who visited him

and through friends made since the preliminary hearing; that no punishment of death by hanging is his deserts and that feeling against him is intense; that he was informed that the deceased officer was highly esteemed in the entire San Joaquin Valley; that he has been informed he was denounced in the pulpit and that the "Fresno Bee" has pictured him in caricature as Walter Yeager, who did the shooting.

The affidavit of Guy D. Carter is to the effect that he made a thorough investigation of the popular mind in and around Madera County concerning appellant; that the people are prejudiced against him; that one of the publishers of the "Madera Tribune" stated in a conversation with affiant that the feeling against defendants was intense and there would have been a hanging but for the lack of leadership; that a real estate dealer made a similar statement; that a stage owner and mail carrier between Madera and Sugar Pine Mills said that the boys at that camp would have made a good job of the hanging if they had been at Madera, and that he has talked with other citizens of good standing in Madera and found the universal feeling is so intense against defendants that they cannot be given a fair and impartial trial.

The testimony of Guy D. Carter amplified his affidavit as to the state of feeling in the county. A. P. Harris, counsel for appellant, in his first affidavit cited several instances where he talked with citizens and described a state of feeling similar to that mentioned in the affidavit of Guy D. Carter. He also averred that the public has been inflamed by reading the denunciations of the press—especially with reference to the past life of appellant. In the second affidavit the showing made is that of the eighty-five veniremen called, forty-seven expressed an opinion concerning the guilt or innocence of appellant, and that of the forty-seven the court excused twenty-eight on that ground; and that the deceased officer was universally loved in the county and enjoyed a good reputation.

Howard A. Clark, publisher of the "Madera Tribune," testified that on the night of the shooting and following the feeling against appellant and Terry was intense but that the feeling in the matter had greatly died down. Also that in cases of this kind the public excitement lasts for a couple

of days and then it commences to pass away. On being recalled he testified that his paper was not circulated in the homes of every eligible juryman in the county.

Robert Brown testified that from talking with several people he formed the opinion that the defendants could not have a fair and impartial trial; that in conversations it was discussed whether or not both men would hang for one crime, and as to whether or not there would be a hanging. He admitted he had said "they would hang sure as hell in Madera County."

D. R. Hanhart, editor of the "Madera Mercury," negatived the suggestion that every person eligible for jury service subscribed for the paper. He also stated that from what he heard he believed the defendants could have a fair and impartial trial in Madera County.

Herman Crow testified he heard the remark that if the defendants had not been caught by other officers they never would have been brought in alive; that he heard people say the defendants would hang, and that according to public opinion they were guilty.

The counter-affidavits are to the effect that the affiants were well acquainted in the vicinity and talked with many people and they heard no discussion that the defendants could not have a fair and impartial trial. Joe Walsh testified that at the county jail at Madera there were twenty or thirty spectators and that at no time had he observed any hostile demonstration or heard any remark against defendants.

The newspaper clippings are as follows: "Madera Tribune," November 13, 1923: "Bandits Slay Legion Man. Fear Lynching of Madera Bandits. Officer Pickett's Slayers are Held at Stockton Jail." The article states that the men were taken to Stockton Sunday night at 7:30 because of the fear of lynching parties from Madera and elsewhere; that when they were taken away from the Merced jail a crowd of about one hundred men emerged from the park; that an attempt was made to take them from the jail but the delay due to the lack of leadership enabled the officers to get the men away; that it was a clear case of murder against the men; that the car revealed a small arsenal and burglar equipment; that Terry placed the blame for the shooting on appellant who refused to make a statement; that his only admission

was that he was present at the scene but claims he was in a dazed condition and does not know what occurred; and that the records will reveal a long trail of crime. The details of the capture were set forth; it was stated that the officer was held in the highest esteem by all who knew him; that his murder caused feeling to run high; and that he is survived by his bride of three weeks, his mother, a brother, and a sister.

"Fresno Bee," November 13, 1923: "Officer's Murder Formally Charged to Two Prisoners. Slaying is Deplored as Cold Blooded. Madera Officers Promise Justice Shall Be Swift to Pickett's Killers." This article stated that the prisoners were taken to the San Joaquin County jail to frustrate violence at the hands of irate citizens; that the burial of the officer was scheduled and full military honors given by the American Legion; that the murder was cold-blooded in the extreme; that there was enough evidence to send the prisoners to the gallows; that five hundred men joined the posse that searched for the men; that the sheriff of San Bernardino County wrote stating that the two men are wanted in that county on charges of being implicated in two street-car holdups and five other robberies.

"Fresno Bee," November 14, 1923: "Bandit Gives More Details of Killing." The clipping stated that Terry told the officers that appellant left the machine and coolly shot the officer several times with an automatic pistol and re-entering the car told Terry he had only shot him in the legs.

"Fresno Bee," November 15, 1923: "Pair Held for Pickett Murder. Back in Madera. Yeager and Terry Returned from Stockton; Prepare for Hearing." This article says the jail is guarded strongly for fear of violence and that no attempt at violence is anticipated, because there will be no delay in the trial; that the district attorney maintains Terry is as guilty as appellant and should pay the extreme penalty; and that five hundred dollars worth of loot was secured by the pair in robberies in San Bernardino.

"Madera Daily Tribune," Wednesday, November 14, 1923: "Walter Yeager Shot in Lung." This paper stated that the shot which entered appellant's back punctured the lung and that he was threatened with pneumonia; that the sheriff of Sacramento County said that Terry was arrested in Sacramento for the theft of an automobile and that he was

released on probation; and that the men were still in the Stockton jail, where they were taken on account of reports that an attempt would be made to lynch them.

November 15, 1923: "Pickett's Slayers are Returned here Early This Morning. Yeager and Terry are under Guard at Jail. Officers hope for Confession. Yeager has Weakened under questioning by Officers." This article stated that both prisoners would be rushed to trial for the inexcusable and cold-blooded shooting down of the officer; that appellant stated that "if they say I shot a man, I did"; that the X-ray showed the bullet narrowly missed his heart and was imbedded in his lung and that Terry said they were going to Fresno to rob a Roeding Park Street car.

Madera, November 16, 1923 (name of paper not given): "Yeager and Terry Preliminary Set." The article states that appellant continues to remain silent, claiming that he has no recollection of the shooting, as he was in a dazed condition at the time; that he is also silent as to his past; that photographs were taken in an effort to gain more information as to their past, and that Terry said appellant told him he had "shot" several safes in the southwest.

"Fresno Evening Herald," November 13, 1923: "Traffic Cop Killers Are Wanted Here. Police Chief confident they are Robbers of Local Service Stations. Trail Covers Wide Area. Witnesses Positively Point to Yeager As Man Who Shot Pickett." This article stated that Sheriff Jones was engaged in an effort to connect Yeager and Terry with the robbery of the Tranquility bank; that Yeager admitted he took part in a bandit campaign starting in Oklahoma and going westward to San Diego; also Fresno, where an oil station was robbed; that Yeager's finger-tips had been filed to avoid finger-prints; that the prisoners were taken from the Merced jail to the Stockton jail because of rumors of lynching; that Yeager was identified as the man who shot the officer, and that a large crowd of people visited the bullet-riddled automobile in which the prisoners made their escape.

"Fresno Evening Herald," November 16, 1923: "Brack Terry Identified as Local Robber." The robbery referred to was that of the Kelley service station, at which $41.85 was taken from the cash register. The article described the pur-

ported plan of the pair to rob a street-car; the bandit campaign starting in Oklahoma was also mentioned.

November 27, 1923: "Attempt Made to Free Terry, Yeager Fails. Try to Liberate Men Held in Madera County Jail for Officer's Death. Fresno Police Notified. Description of Man who Got Away is Broadcasted Over Valley." This article referred to the purported attempt of two men to liberate the prisoners; one of the men was captured.

"The Fresno Republican," November 27, 1923: "Madera Police Foil Plot to Free Slayers. Man Confesses Taking Steel Saws to Men Held for Murder. Planned Jail Guard Holdup. Confederate Set Night of November 29 for Attempt." This article purports to give the details of the plot.

"Fresno Evening Herald," November 16, 1923: "Alarming Situation is Faced by Madera; Lack of Traffic Men is Felt." The article concluded with this statement: "The community seems to be a unit in its determination that no more foul and cold-blooded murders such as that of Officer Pickett shall take place again."

"Fresno Evening Herald," November 16, 1923: "Highwaymen in Shackles Brought Back to Madera Jail on Murder Charge." This article is of the same import as that in the "Fresno Bee" of November 15, 1923.

"Fresno Bee," November 12, 1923: "Madera Officer Murder Suspects Admit Connection. Second Man Breaks Silence to Declare He Was in Daze at Time of Shooting; Long Career of Banditry Charged to Pair; Both Removed to Stockton Jail." This article purports to relate the entire story of the shooting, the escape and capture and removal to Stockton jail of the prisoners, and their past criminal activities. "Murder of Traffic Officer Should Bring Death Penalty." This article states that indignation is high in the community, that many editorials of newspapers have been published concerning the affair—that the paper has long advocated a state law making the death sentence compulsory for the killing of an officer in the discharge of his duty.

"Fresno Bee," November 16, 1923: "Fresno Crime Now Charged Against Terry." This article states the identification of Terry as the robber of the service station, was effected through the means of photographs.

"Fresno Bee," November 17, 1923: "Alleged Pickett Slayers' Hearing Set For Tuesday. Yeager Demands Counsel at Preliminary Action in Madera." The murder was characterized as "brutal" and the station robbery was mentioned again.

"Fresno Bee," November 22, 1923: "Arraignment Set for Two Held on Murder Charge."

"Fresno Bee," November 27, 1923: "Plot to Free Alleged Pickett Slayers Foiled." This related the purported incident of the Russian youth who attempted to give hack saws to the prisoners. The boy confessed.

"Fresno Republican," November 12, 1923: "Yeager Says Mind is Hazy About Slaying. Man who is Believed Killer of Officer Breaks Silence." The article further stated that "No chances will be taken by the county officers here should mob enthusiasm overcome prudence, it was said."

"Fresno Republican," November 14, 1913: "Yeager, Terry Will be Given Early Trial. Coroner's Jury Fixes Blame; Held Funeral of Slain Officer." The coroner's jury at an inquest found that the officer came to his death from a gunshot wound inflicted by appellant, which gun had been given him immediately prior to the shooting, by J. B. Terry.

Section 1033 of the Penal Code provides: "A criminal action may be removed from the court in which it is pending on application of the defendant, on the ground that a fair and impartial trial cannot be had in the county." It was said in *People* v. *Kromphold,* 172 Cal. 512 [157 Pac. 599]: "Each case must be determined according to its own peculiar facts and circumstances, and these vary so in different cases that little help can be obtained from decisions in other cases."

[9] The jurisdiction of the superior court with respect to the removal of criminal actions to another county for trial is special and can be exercised only in the case mentioned in said section 1033. [10] It is not sufficient to require a court to grant a change of venue that there is some excitement in the county upon the subject of the action, or that the victim of the crime was a popular official, or that a fair and impartial jury cannot be selected from a certain portion of the county. Ordinarily, a highly inflamed condition of the public mind prejudicial to a

194 Cal.—31

defendant charged with crime finds some manifestation through the public press, or by assemblages of the people. [11] "However, the mere fact that the press expressed the opinion that the prisoner is guilty does not afford sufficient ground for a change of venue where it does not appear that the crime has been a subject of general and universal conversation at any time, or that any serious portion of the community is hostile to him. And even where there was at any time great prejudice against the defendant, a change of venue will be denied if the excitement in the community has entirely subsided prior to the application therefor" (7 Cal. Jur., sec. 63, p. 916).

The application for a change of venue was made on December 4, 1923, the first day of the trial, and denied on December 7, 1923, the fourth of the seven days the trial occupied. Thus twenty-four days had intervened between the day of the murder and the filing of the application and commencement of the trial. The court, when it denied the application, had the benefit of the examination of the jurors on *voir dire,* for the jury had already been impaneled and sworn. According to the newspaper clippings, the last account of the murder and its aftermath was published on November 17th, seven days after the killing and seventeen days before the filing of the application and the impanelment of the jury was entered upon. Apparently no exception was taken to the publications between November 17th and November 27th. The three accounts of November 27th appear to have had their inspiration in an asserted attempt to liberate the prisoners from the county jail at Madera. In one of these articles it is stated that the liberation of the prisoners was impracticable for the reason that they were kept in different parts of the jail in order that "they might not form similar stories of the slaying" of the officer.

[12] In the face of the record we find no warrant for holding that the court erred in deciding that the defendants could have a fair and impartial trial in Madera County. The court probably arrived at the conclusion that the manifestations of excitement and resentment in that part of the San Joaquin Valley, and in the newspaper articles, represented the usual result upon the public mind of a murder of the character of this one. It is readily conceivable that

the slaying of the officer under the circumstances shown would create very considerable feeling in the parts of the San Joaquin Valley where he was known and admired. But we have seen that the killing of a popular officer in itself furnishes no ground for a change of venue, and from the showing it would be well within the province of the court to conclude that whatever excitement and resentment may have been caused by the killing had subsided before the trial was begun. The fact that when the jury was completed Terry had four and appellant two unused peremptory challenges indicates persuasively that the able counsel for the defendants believed a fair and impartial jury to try them could be and was found in the county of Madera.

3. This point is thus stated: "The court erred in admitting evidence of the prosecution introduced for the purpose of establishing a conspiracy, Reporter's transcript, page 137, inasmuch as it was apparent at the time the court made its ruling that a conspiracy could not have existed prior to the time that the defendants were stopped by Pickett." It is by no means clear that the point is presented by the record, but we will, nevertheless, consider it. This contention proceeds on the assumption that as the officer was not known to the defendants before he stopped them on the highway they could not have entered into a conspiracy to murder him. But according to the evidence there was an interval of time between the halting of the car on the highway and the killing of the officer. During this space abundant opportunity was afforded them to form a mutual resolve to murder him rather than to go to jail and perhaps to the penitentiary. Re-entering the store of C. T. Wright with the intent to steal the revolver might be held to be burglary and appellant an accomplice, for although Terry carried on the negotiations, appellant was present. The suggestion in the record of previous criminality might also have influenced them to commit the deed for mutual protection. These and other matters suggested by the record were for the jury to consider in determining whether when Terry says he handed the automatic .45 to appellant so that the officer would not see it, he in fact did it because there was an understanding between them to use it on the officer. **[13]** Terry's statement that he and the officer were standing together while appellant

stood alone back of the car might have been found to be true and that it was a part of the criminal scheme to thus engage the officer's attention, thereby giving appellant a chance to shoot him down. If the jury so believed, then a conspiracy was established, for the passing of the weapon would constitute an overt act. **[14]** The law fixes no time at which a conspiracy must have been entered into, and, it may be added, it does not provide that it have any particular duration. It is not necessary that two persons should meet together and enter into an explicit or formal agreement to commit the crime, or that the conspiracy should be expressed in words. If in any manner the conspirators tacitly come to a mutual understanding to commit a crime it is sufficient to constitute a conspiracy. (See 5 Cal. Jur., sec. 3, p. 497.)

**[15]** Aside from these considerations, however, if the defendants started out that day on a felonious mission to violate the law by stealing or taking life, with the determination not to submit to arrest under any circumstances, and they took with them firearms, jimmies, or other tools to aid in effectuating their felonious purpose—and the evidence would justify an inference that such a design had been mutually formed and persisted in—and that as a part of such common design they caused the death of the officer, evidence of previous felonious acts on that day would be clearly admissible in proof of the conspiracy (see *People* v. *Kauffman*, 152 Cal. 331 [92 Pac. 861]), for the common motive and intent to commit such crimes would attach to every felonious act so committed and their every act and declaration up to the culmination of the conspiracy would be provable against each. And in such circumstances it would not be necessary for the prosecution to show that the criminal enterprise in its inception had in contemplation any particular crime against property or person. We think the rulings were correct.

**[16]** 4. Misconduct of the jury is assigned under this head. An affidavit of Guy D. Carter avers that he had two conversations with one Pat Kennedy concerning statements claimed to have been made to him on December 11, 1923, by John Lorentzen, a juror in the case, while the trial was pending, to the effect "that it looked bad for Yeager"; that affiant answered he agreed with him and

that appellant should be hanged; that in the presence of affiant and A. P. Harris, counsel for appellant, said Kennedy made other statements that the juror had made up his mind relative to the guilt of appellant during the progress of the trial and prior to the submission of the case to the jury, and that Kennedy questioned juror Lorentzen as to the attitude of juror W. M. Brown, and he answered that juror Brown had made up his mind and would convict appellant; and that on the ground of a life-long acquaintance with Lorentzen, Kennedy, on December 13, 1923, refused to make an affidavit of the above facts, and for the further reason that he and everyone in the neighborhood thought appellant should, and that they would like to see him, hang. Attorney Harris also filed an affidavit on the same subject but it does not state the juror made the statements to him or that he heard him make them to Kennedy. The statements asserted to have been made by the juror were clearly hearsay and inadmissible for any purpose (*People* v. *Azoff*, 105 Cal. 632 [39 Pac. 59]; *People* v. *Dobbins*, 138 Cal. 694 [72 Pac. 339]; *People* v. *Soap*, 127 Cal. 411 [59 Pac. 771]; *People* v. *Kromphold*, 172 Cal. 512 [157 Pac. 599]; 8 Cal. Jur., sec. 457, p. 434).

[17] 5. Appellant contends that the court abused the discretion conferred by section 1121 of the Penal Code in allowing the jury to separate between sessions of the court. It is not claimed that the jury was allowed to separate after the submission of the cause. Appellant relies on the showing made in support of the application for a change of venue to prove an abuse of discretion in allowing the jury thus to separate. But being a matter of discretion, and no showing of prejudice having been made, we find no merit in the point.

6. It is earnestly urged that the court erred in admitting evidence of conduct against appellant predicated on his remaining silent when Terry made his extrajudicial statement in the office of the sheriff which, as we have shown, imputed the killing of the officer and other incriminatory acts and declarations to appellant. At the making of the statement appellant was present only a part of the time, and the court in its rulings was careful to limit the evidence tending to show conduct to the part of the statement made when appellant was present. Counsel for appellant

approved the language of the court in admonishing the jury to consider as applying to appellant only the statements of Terry made when he was present. The question presented, then, is whether evidence of appellant's conduct under those circumstances was admissible.

[18] The admission of such evidence is an exception to the hearsay rule. [19] Evidence of conduct is receivable if it tends to show a consciousness of guilt or intent—such as flight, concealment, preparation, or other acts or declarations inconsistent with the theory of innocence (8 Cal. Jur., sec. 157, p. 42). Such evidence is not admissible for the purpose of proving the truth of the accusatory statements, but rather as indicating a consciousness of guilt on the part of the accused by allowing an imputation opposed to the presumption of innocence to pass unchallenged. [20] It is for the court in the first instance to determine whether the import of the statements is such that it would furnish a foundation for proof of conduct, and it is then for the jury to decide whether the accused was aware the statements were made, whether, under all the circumstances shown, they called for a disclaimer, whether the accused did reply to them, and whether if he did not do so, such failure showed criminal intent or a consciousness of guilt. If these propositions of fact are resolved in favor of the prosecution the item of conduct should be given the effect to which upon the entire case it is entitled. [21] Such accusatory statements are admissible against a defendant whether he be tried alone or jointly, provided that in the latter case they are properly limited to the defendant concerned.

[22] When a person is charged with crime a presumption of innocence arises which attends the accused until it is overcome by proof of guilt to a moral certainty and beyond a reasonable doubt. In other words, the burden of establishing guilt thereby rests upon the prosecution, and any evidence, otherwise competent, which tends to rebut such presumption is admissible just as any competent evidence tending to support it is available to the accused. [23] Accusatory statements are therefore admissible because, if not denied, the failure to deny them is inconsistent with and tends to rebut the presumption of innocence. But unless the statements tend to negative the presumption of inno-

cence they are not to be received against the accused, for
the denial of an accusatory statement would tend to support
the presumption of innocence and is not therefore
admissible, since such a denial is embraced in the plea of not
guilty. For authority on the general question of conduct,
see *People* v. *Amaya,* 134 Cal. 531 [66 Pac. 794]; *People* v.
*Teshara,* 134 Cal. 542 [66 Pac. 798]; *People* v. *Philbon,*
138 Cal. 530 [71 Pac. 650]; *People* v. *Cole,* 141 Cal. 88 [74
Pac. 547]; *People* v. *Weber,* 149 Cal. 325 [86 Pac. 671];
*People* v. *Bringhurst,* 192 Cal. 748 [221 Pac. 897]; *People*
v. *Turner,* 1 Cal. App. 420 [82 Pac. 397]; *People* v. *Sulli-
van,* 3 Cal. App. 502 [86 Pac. 834]; *People* v. *Ayhens,* 16
Cal. App. 618 [117 Pac. 789]; *People* v. *Bradley,* 23 Cal.
App. 44 [136 Pac. 955]; *People* v. *Hartwell,* 37 Cal. App.
799 [175 Pac. 21]; *People* v. *Graney,* 48 Cal. App. 773
[192 Pac. 460]; *People* v. *Healey,* 52 Cal. App. 563 [199
Pac. 551]; *People* v. *Gordon,* 61 Cal. App. 98 [214 Pac.
276].

The statements made by Terry in the presence of appellant
include those that appellant loaded the automatic .45
after it was stolen in the early part of the day; that Terry
passed it to him just before the shooting; that the officer
was close to appellant at the time of the shooting; that appellant
said, "I shot him in the leg"; that he saw the .45
in appellant's hand after the shooting; that appellant
loaded the .45, taking the cartridges from Terry's pocket;
that appellant proposed going to Mexico; that they changed
their clothes and that when they were fleeing appellant
directed Terry as to the route to take. It is to be presumed
from the adverse verdict that the statement was held
to call for a reply. We quote from the examination of the
official reporter who took down the statement in the sheriff's
office, transcribed it and was on the witness-stand when it
was read to the jury: "Mr. Bailey: Q. During the taking
of this statement . . . did the defendant comment, Yeager,
make any comment or say anything? A. No, sir." The
motion to strike out the portion of the statement made in
the presence of appellant was properly denied.

7. Appellant next contends that where two persons are
jointly indicted and jointly tried, neither is a competent
witness for the other unless immediately acquitted by a jury
or a *nolle prosequi* be entered and that the rule is the same

whether the trial be joint or several; that prior to the amendment of section 1098 of the Penal Code in 1921 it was the rule that where two defendants were jointly indicted and separately tried each was a competent witness for the other, citing *People* v. *Labra,* 5 Cal. 183, and *People* v. *Newberry,* 20 Cal. 439, and concludes, "it is only in case of a separate trial that evidence of a codefendant has ever been competent in California. Since a separate trial is no longer a matter of right, there can be no waiver, and consequently the evidence of a codefendant is never competent except in cases in which the court has ordered a separate trial in accordance with the provisions of section 1098."

[24] It is within the province of the legislature to vest the trial court with authority to decide whether there shall be a separate or a joint trial of defendants jointly charged. The competency of witnesses in a criminal action is prescribed by the constitution and statutes. " . . . No person shall be . . . compelled, in any criminal case, to be a witness against himself" (art. I, sec. 13, Const.). The Penal Code provides that codefendants must be jointly tried unless the court order separate trials (sec. 1098); that where two or more defendants are jointly charged the court may at any time before they have gone into their defense, on the application of the district attorney, direct any defendant to be discharged that he may be a witness for the people (sec. 1099); and such an order is a bar to another prosecution for the same offense (sec. 1101). And where two or more persons are included in the same charge, and there is not sufficient evidence to put one on his defense, the court must order him to be discharged before the evidence is closed that he may be a witness for his codefendant (sec. 1100) and such an order is likewise a bar (sec. 1101). [25] There is no provision of law or authority in this state that on a joint trial a codefendant is not a competent witness for himself or for his codefendant. He may become an involuntary witness for the people under section 1099, or for his codefendant under section 1100. [26] Terry was a competent witness (sec. 1321, Pen. Code; sec. 1879, Code Civ. Proc.) if he elected to testify, either for himself, for his codefendant, or for the prosecution, but neither defendant could be compelled to be a witness for the prose-

cution or for his codefendant unless the provisions of sections 1099 or 1100 were put in force. To reach a contrary conclusion would preclude a codefendant jointly tried from giving testimony in his own behalf, or compel the prosecution to move for the discharge of a guilty man in order that he might be available as a witness for his codefendant, thus in effect nullifying the amendment of section 1098. The point is without merit.

8. Appellant's final point is that the court erred in denying his motion for a new trial. It is contended that the affidavits in support of the motion for a new trial are sufficient to entitle him to such relief, as no counter-showing was made by the prosecution. The brief of appellant points out that A. P. Harris, attorney for appellant, was refused five days' additional time to procure further affidavits, and was also refused permission to take the witness-stand upon the hearing of the motion "to testify as to matters of great importance." The brief contains this further statement: "It is submitted that it was error for the court not to give Yeager an opportunity to make further showing upon the motion for a new trial, and error also in refusing a new trial upon the showing that was made."

The affidavit of attorney A. P. Harris avers that prior to the trial, on the 4th of December, 1923, he had but two or three very short conversations with appellant; that he had great difficulty in understanding him; that appellant was physically ill from a wound received at the time of his capture; that his condition could not be comprehended by the affiant and that the appellant could not make the statement of his defense to affiant because of a defect in hearing, "which puzzled your affiant and made all conversation fruitless for the reason that your affiant was compelled to hiss his advice and counsel through the bars of the cell"; that although physically present appellant could not hear the testimony adduced on behalf of the people, except as to a part of the testimony of H. B. Terry; that because of appellant's wound and the defect in his hearing, his sister and her friends did not approve of the appellant taking the stand in his own behalf; and that the extrajudicial statement of appellant, incorporated in the affidavit, did not come to his attention until the case was submitted to the jury, which statement is to the effect that

Mason A. Bailey, district attorney of Madera County, told appellant he did not have to answer the questions, that they must be free and voluntary answers, and that he would get no reward or immunity if answers were made. During the course of the examination appellant said he knew H. B. Terry by the name of "Harry"; that he had known him about two or three weeks; that he did not remember being stopped on the highway by an officer; that he had no recollection of being in Merced; that he never owned nor had a loaded .45 automatic near Merced; that he did not remember that he was handed the automatic when they got out of the car on the highway; that he only remembered getting in the car and that they were headed for Stockton because "we was talking it over about going to Stockton"; that he knew nothing about saying "stick'em up"; that he did not tell Terry to turn off on the side road; that he did not tell him to go to Mexico; that all he remembered was that he laid down in the car and went to sleep and did not know whether they started or not; that he knew nothing about shooting the officer with a .45 automatic; that he did not remember changing his clothes; that he did not remember taking a sign off of the rear of the car with a pair of pincers; that another car ran into Terry when he turned off on a side road; that he did not shoot the officer—"If I knew I would say, but, I don't know"; that he would not say that Terry did it; that he was lying in the car "stewed" and did not remember a thing about it, and that he woke up when he got shot. The affidavit of the attorney further states that the extrajudicial statement shows that appellant was intoxicated and his senses "dunned" by the intoxication, and "substantiates the statement of the sheriff" that appellant had taken a concoction one day prior to the shooting which numbed his senses; that the statement of appellant was in the possession of the district attorney at all times; that H. B. Terry is a convicted felon; that affiant had no opportunity of knowing this, and could not at the trial ask Terry if he were a convicted felon, in order to impeach and discredit his testimony.

The affidavits considered under point 4 concerning the juror, John Lorentzen, were filed in support of the motion. For the reasons already stated these affidavits are incompetent for any purpose.

The extrajudicial statement imputed to appellant in the affidavit of A. P. Harris might more properly have been introduced in evidence during the trial. With the exception of the extrajudicial statement, affiant fails to show any newly discovered evidence, and the extrajudicial statement was only new as to him, for the court on the hearing of the motion must have concluded that appellant knew he had made it.

There is no showing that appellant could not, with reasonable diligence, have discovered and produced the supplemental evidence at the trial (subd. 7, sec. 1181, Pen. Code) and have it determined on its merits. "The claim of newly discovered evidence warranting a new trial is universally looked upon by the courts with distrust and disfavor. Public policy demands that a litigant should be compelled to exhaust every reasonable effort to produce at his trial all existing evidence in his behalf. It has been said that the circumstance that the testimony has just been discovered when it is too late to introduce it is so suspicious that courts require the very strictest showing of diligence." (8 Cal. Jur., p. 427.) [27] The question of granting an application for additional time to supplement the showing by additional affidavits and oral examination and the question of the sufficiency of the newly discovered evidence are addressed to the legal judgment and sound discretion of the trial court, and we perceive no reason for disturbing the order denying the motion for a new trial.

An exhaustive study of the record induced by an appreciation of the plight of appellant satisfies us that the case is singularly free from error and that he had a fair and impartial trial.

Judgment and order affirmed.

Waste, J., Richards, J., Seawell, J., Shenk, J., Lennon, J., and Myers, C. J., concurred.