[Crim. No. 1386.  First Appellate District, Division One.—December 1, 1927.]

THE PEOPLE, Respondent, v. ANTONE PARISI, Appellant.

George M. Lipman and Milton T. U'Ren for Appellant.

U. S. Webb, Attorney-General, and Emery F. Mitchell, Deputy Attorney-General, for Respondent.

KNIGHT, J.—The defendant was charged by indictment with the infamous crime against nature and upon trial was found guilty. He has appealed from the judgment of conviction and the order denying his motion for a new trial. As grounds for reversal he contends that the trial court improperly limited his cross-examination of the prosecution's witnesses, and thereby deprived him of the right to show that his arrest and prosecution were the result of an attempted extortion; also that the court erred in arbitrarily refusing to grant him time to secure affidavits to be used on motion for a new trial.

The circumstances leading up to the defendant's arrest, as they appear from the evidence, were as follows: The alleged crime was committed upon a boy eighteen years of age with whom and with whose family defendant had been

on friendly terms for many years. At the time of his arrest, and for some time prior thereto, defendant lived alone in a couple of rooms constructed mostly of windows and glass doors on the roof of a building which he owned on Kearny Street, San Francisco. During the early part of May the boy's mother became suspicious of her son's appearance and conduct, and, unknown to the boy, employed a private detective named Otts to ascertain the character of the boy's habits and associates. While pursuing this employment, and about 6 o'clock on the evening of May 19th, Otts saw defendant talking to the boy on the street near defendant's premises and overheard him apparently make an appointment to meet the boy at 8 o'clock, pointing in the direction of his, the defendant's, apartment. Thereupon Otts informed the boy's mother that her son had been frequenting defendant's living quarters and was going to meet him there that night at 8 o'clock. She replied that there was no objection in his doing so; that defendant had been a good friend to the family for many years, particularly since the death of her husband some six years before; that he had been like a father to the boy, and consequently she was glad to have the boy in defendant's company. Being unable to convince her of a probability of improper relations existing between the two, and without notifying her or anyone else of his intention, Otts planned to conceal one of his operatives in or near defendant's apartment at the appointed hour that night, which he succeeded in doing in the following manner: The rear portion of defendant's premises facing an alley, contained a garage, the keys to which were in defendant's possession, wherein were stored certain motor vehicles, one being a truck belonging to an acquaintance named Mrs. Donati, which she wanted to sell. Otts told the boy's mother he desired to purchase the truck for a friend and to have Mrs. Donati meet them at the garage that night about 8 o'clock for the purpose of allowing him to inspect the truck. According to the testimony of the prosecution's witnesses, none of them knew of Otts' real purpose in asking to inspect the truck. The boy's mother and Mrs. Donati were accompanied to the garage by the boy, his married sister, and Otts; whereupon defendant was summoned from his apartment by the boy's sister to open the garage and allow the inspection to be made.

While the defendant was thus engaged, Otts left the garage under the pretext of going to phone to the prospective buyer of the truck, and while gone succeeded in concealing his operative in the defendant's apartment. Soon after Otts left the garage the women and the boy started to leave, but, according to the testimony of the boy, his mother, and his sister, defendant placed his hand on the boy's arm and asked him to remain, which he consented to do. The women then left, and defendant, after closing and locking the garage, proceeded with the boy up the back way to his apartment, where, it is claimed the alleged criminal act was committed. During the perpetration of the act Otts' operative came out from his place of concealment under the bed and called loudly for Otts, who, it seems, after leaving the garage, returned to the street to bring the boy's mother and his sister to the roof and then concealed himself near a window where he could observe what occurred inside defendant's apartment. Immediately upon hearing his operative call for him Otts broke through the glass door and entered the apartment, followed by the boy's mother and sister; and, according to their testimony, they saw the defendant and the boy just coming out of the bedroom, both partly disrobed. It is unnecessary to relate the details of the animated discussion which followed more than to say that, according to the prosecution's witnesses the boy, in defendant's presence, admitted that the crime charged had been committed upon him by defendant, not only that night but on frequent occasions since the death of his father, as a result of which he had become diseased. The defendant did not deny these accusations, so the prosecution's witnesses testified, but tried to persuade the boy's mother and Otts against causing his arrest, stating that such action on their part would only bring disgrace upon the boy; that he would see to it that the boy was cured of the disease and that he would "fix the whole thing" by paying the boy's mother a large sum of money, and, furthermore, that he offered to pay Otts fifteen hundred dollars, saying he had known similar cases to be fixed for one thousand dollars. All of these propositions were emphatically rejected, however, and the boy's mother insisted that defendant be taken to prison. Thereupon she left for home, accompanied by her son and her daughter.

At the trial defendant denied ever having had improper relations with the boy and charged that his arrest was the result of a scheme to extort money from him. In support of his claim of innocence defendant testified that on the night in question the boy left the garage with the others; that thereupon he locked the doors and proceeded toward his apartment alone; that about the time he reached the roof he observed Otts and the boy's mother and his sister standing near his front door waiting, as he thought, for him to open the door; that the front door was fastened with a nail on the inside and that, consequently, he entered through the rear door, intending to pass through the house to open the front door, but that as he entered the rooms he found the boy lying on the bed and at the same time saw a man with a pistol crawling out from beneath the bed, immediately following which Otts, the boy's mother and his sister entered the room and accused him of having committed the criminal act charged.

The numerous rulings criticised by defendant run throughout the record, and are discussed in his brief in the order in which they were made. In considering the same here, we shall for convenience group them with reference to the subject matter to which they relate.

■ The direct examination of the boy's mother and of Otts ended at the point where the women and the boy left defendant's apartment and started for home. On cross-examination defendant's counsel sought to prove what had taken place subsequent to that time. The prosecution interposed numerous objections, mainly upon the ground that the testimony sought to be elicited was not cross-examination, and many of these objections were sustained. Defendant contends that as a result of these rulings he was deprived of the right to show that later on that night, at Otts' office, an attempt was made to extort money from him. With respect to the admissibility of this kind of proof the law doubtless allows the motives of an adverse witness to be inquired into for the purpose of repelling the presumption that he speaks the truth (Code Civ. Proc., sec. 1847), and consequently a witness may be impeached by showing that he has instigated the prosecution for the purpose of extortion or revenge. But the decisions hold that in order to lay the foundation for such impeachment, the witness must

first be asked the direct question if he has not begun the prosecution for the purposes mentioned (*People* v. *Delbos*, 146 Cal. 734 [81 Pac. 131]; *People* v. *Emmons*, 7 Cal. App. 685 [95 Pac. 1032]). In the present case defendant's counsel did not follow the foregoing rule, but, on the contrary, proceeded to prove on cross-examination the subsequent occurrences of that night in the chronological order in which they happened, that is, to show step by step what next occurred after the women and the boy left defendant's apartment. The trial court was consequently justified, we think, in sustaining the objections to the questions put in the form mentioned.

In announcing its rulings and in explanation thereof, however, the trial court stated, in effect, on at least two occasions, that it recognized defendant's right to impeach the prosecution's witnesses upon the grounds mentioned and was willing that he should do so providing he complied with the rule above stated; and pointed out to defendant that under such rule he would be allowed to ask direct questions to show the motives of the witnesses, but was not allowed to accomplish that purpose by interrogating the witnesses as to the subsequent transactions occurring that night which were not touched upon during their direct examination, because, the court remarked, if such course were followed much immaterial matter would be brought before the jury. Finally, however, counsel for defendant did elicit from the witnesses testimony sufficient to lay the foundation for the introduction of impeachment evidence, the boy's mother having testified that no demands for money were made in her presence, and Otts having testified that no one other than the defendant mentioned the payment of money to drop the case. But, when the time arrived to bring forth the impeachment evidence, defendant, although having previously stated that "they" demanded money, etc., indicating that Otts and the boy's mother had done so, expressly disclaimed that either of them had ever made such a demand, and stated that the only demand came from a man named Montgomery, which was made in Otts' office on Market Street, where he was subsequently taken and detained by Otts until midnight, after which he was delivered into the custody of the police at the police station; that those present at Otts' office besides Otts and the defendant were

Montgomery, and, part of the time at least, an attorney called in by the defendant, the boy, his mother, and his sister; but in answer to questions propounded by the court defendant clearly stated that the only demand made upon him for money came from Montgomery while only himself and Otts were present. No evidence was thereafter offered on behalf of the defendant to prove, nor did it anywhere appear in the record, how or under what circumstances Montgomery appeared in the case or what his connection was therewith; neither did Montgomery testify as a witness in the case; therefore, on motion of the district attorney the court ordered stricken out as hearsay defendant's previous testimony indicating that the demand for money came from the prosecution's witnesses. Immediately following this ruling defendant's counsel resumed the examination, and defendant repeated his former statement that no one except Montgomery had ever made a demand for money, his testimony being as follows: "Mr. Lipman (attorney for defendant): Q. Now, how long were you in this office, Mr. Parisi, on Market Street? . . . A. I was there more than three hours. Mr. Lipman: Q. Well, did anyone else besides Mr. Montgomery speak to you regarding money in that room at that time that night? . . . A. No." This latter testimony was not stricken out, and thereupon the evidence as to the demand for money ended. It therefore appears that notwithstanding the rulings complained of limiting the cross-examination of the prosecution's witnesses, defendant was permitted to and did in fact establish the foundation for the impeachment testimony and, furthermore, was afforded an opportunity to produce the same, but by his own testimony proved that the demand which he claims was made came from one not shown to be connected in any way with the witnesses who had appeared against him. Since the defendant contradicted Otts' testimony to the effect that no demand for money was made by anybody in his presence, defendant was doubtless entitled, in support of his claim that such a demand was made, to relate the nature of the demand and the circumstances under which he claims it was made. But as pointed out, after he had sworn to the fact that it was Montgomery who made the demand, further examination by his counsel on this point was apparently abandoned; therefore, since Montgomery was not called as

a witness, the conflict arising between defendant's testimony and that of Otts, as to whether Montgomery had made such demand, was left for the jury to resolve from such evidence as it had before it. The state of the record described therefore shows that despite any technical errors which may have been committed by the trial court in ruling upon particular questions, defendant was not deprived of any substantial right.

Defendant further contends that he was denied the right to prove on cross-examination of the boy that the latter knew of Otts' employment and of the latter's plan to entrap the defendant; but the record does not support this contention, for it shows that the boy was cross-examined upon the subjects mentioned and testified that he had no conversation with his mother or sister or with Otts about the matter; and that he was not aware of the nature of Otts' business. Neither does the record sustain defendant's claim that he was not allowed to cross-examine the boy as to what occurred after leaving defendant's apartment, for it shows that defendant did quite fully interrogate the boy upon such matters. The only question ruled out related to the hour defendant left Otts' office, and this fact was established by other proof and in any event was not disputed.

Defendant complains also of the comment made by the trial court in overruling the prosecution's objections to the cross-examination of the boy with reference to certain contradictory statements claimed to have been made by him at a previous trial of the action relating to the question of whether or not the detective who was under the bed was armed, and as to the description given by the boy of the defendant's clothing. In making its ruling the court remarked that although in its opinion the testimony was immaterial, the same would be allowed to stand; that the jury was to weigh it for what it was worth. But the jury was charged at the conclusion of the evidence that the jurors were the sole and exclusive judges of the weight of the evidence and that the court had not intended to intimate what inferences were to be drawn from the evidence adduced, and that if any expression of the court so indicated, such expression was to be disregarded. Therefore, we do not believe that the remarks complained of operated against the defendant with any prejudicial effect. Defendant did not offer in

evidence the portion of the transcript of evidence taken at the former trial by which he sought to impeach the boy's testimony as to the period of time elapsing between the time he left the garage and the time when Otts broke into defendant's apartment; consequently we are unable to say whether or not the court erred in holding as it did that the asserted contradiction was immaterial.

The rulings complained of in connection with the cross-examination of the boy's mother, other than those already noticed, are not of a serious nature. As to whether or not she knew who lived on defendant's premises would seem to be unimportant, because she had already testified that on the night in question she saw none of the inmates of the house; and the asserted suggestion by the court of two answers during the cross-examination of the witness about which complaint is made was harmless, because the court, apparently to save time, merely repeated the answers already given by the witness on cross-examination on the same point, neither of which answers was vital, having relation only to the witness' estimate of the period of time elapsing between the time she was going from the garage to the roof and while she was waiting at the top of the stairway near the roof before entering defendant's apartment.

Neither can we sustain the contention that defendant was not allowed on cross-examination to test the memory of the witness Otts as to the kind of a coat defendant was wearing, and as to the order in which the parties left defendant's apartment that night; also with reference to fixing the time when Otts first arrived at the garage. An examination of the record discloses that either before or after the rulings complained of were made the witness was interrogated upon these points. We have examined the remaining points urged by defendant relating to the cross-examination of the prosecution's witnesses, but do not believe they possess sufficient merit to require discussion.

■ Defendant's final contention is that the court abused its discretion in refusing to continue the hearing of the motion for a new trial. The application for continuance was made orally by defendant's counsel in which he stated that defendant desired time to secure affidavits in support of his motion; but he did not disclose whose affidavits de-

fendant expected to obtain nor what the contents of the affidavits would be, nor why the affidavits had not already been secured; neither was it stated that there were reasonable grounds to believe that the same could or would be obtained in the future, or if so, when. As said in *People* v. *Burrows,* 27 Cal. App. 428 [150 Pac. 382] : "In the absence of any showing that it (the continuance) will inure to the benefit of the defendant or be likely to right some wrong that may have been done him, how can the court say that any continuance should be granted? This cannot be assumed from the mere application for a delay. There must be some evidence offered in support of the application. Here the bald request was made of the court without any pretense of evidence or suggestion of any fact that would indicate the justice or propriety of granting the motion. There was no intimation of what was expected to be set forth in said affidavits, nor was any reason shown why the affidavits had not already been secured." For the reasons stated in that case, it is apparent that the application for the continuance in the present case was properly denied. (*People* v. *Winthrop,* 118 Cal. 185 [50 Pac. 390] ; *People* v. *Ross,* 134 Cal. 256 [66 Pac. 229] ; *People* v. *Yeager,* 194 Cal. 452 [229 Pac. 40] ; *People* v. *Ortiz,* 63 Cal. App. 662 [219 Pac. 1024].)

In conclusion it may be stated that in view of the serious nature of the charge against the defendant and the circumstances attending his arrest, we have scrutinized the record in the case with care and although it would seem that the trial court required defendant's counsel in the presentation of the defense to adhere strictly to the rigid rules of evidence, we are not prepared to say that the rulings complained of had the effect of depriving defendant of a fair trial, nor do we believe, in view of the evidence adduced against him, that the trial has resulted in a miscarriage of justice.

The judgment and order appealed from are therefore affirmed.

Tyler, P. J., and Cashin, J., concurred.