[Crim. No. 3650.   Second Dist., Div. Two.   Dec. 15, 1942.]

THE PEOPLE, Respondent, v. HOWARD C. SHOFSTALL, Appellant.

Richard A. Haley for Appellant.

Earl Warren, Attorney General, and Burdette J. Daniels, Deputy Attorney General, for Respondent.

McCOMB, J.—From a judgment of guilty of burglary in the first degree after trial by jury defendant appeals.   There is also an appeal from an order denying his motion for a new trial.

The facts in the instant case as they appear from the testimony of admitted accomplices of defendant are:

Defendant, who had been employed as a chauffeur and bodyguard by Mr. and Mrs. T. M. McKenna for a period

of five or six years, terminated his employment with them in December, 1940. In February, 1942, defendant was introduced to Cecil Imes by a man named Paul Mitchell. At this meeting defendant asked Mr. Imes if he would be interested in burglarizing a home in Beverly Hills, stating that there were furs, jewelry, and he believed approximately $1,000 in money in the home. On this occasion defendant explained the different doors and windows in the McKenna house and stated that he would find out when Mrs. McKenna would be home. He said that she usually visited her husband who was ill in a hospital during the early evening hours. He also told Mr. Imes there was a closet located at the top of the stairway leading to the second floor of the residence, that a safe was located inside this closet and that the closet would contain a mink coat, a fox coat, an ermine coat, a black caracul coat, and various other furs; and that the safe would contain jewelry of various kinds. It was agreed that defendant and Mr. Mitchell would receive forty per cent of the proceeds of the robbery and that Mr. Imes and his partner Alexander Piascik would receive the remaining sixty per cent of the proceeds.

The following day defendant met Messrs. Mitchell and Piascik. There was a similar conversation to that which had taken place the day before. The following day defendant met Messrs. Imes and Piascik in a hotel in Hollywood, stating that he had just called Mrs. McKenna and found she was at the hospital visiting her husband, whereupon Messrs. Imes and Piascik proceeded to the McKenna home, and, upon finding several lights burning in the house, returned to the hotel and reported this fact to the defendant. The next day Messrs. Imes and Piascik again talked with the defendant, visited the McKenna home, and returned without entering it, having found several automobiles in front thereof. On one occasion defendant and Mr. Imes went to Mrs. McKenna's house and talked concerning the prospective burglary. On this occasion defendant showed Mr. Imes where certain French windows were located in the house and how admittance could be gained through them.

February 16, 1942, at about 8 o'clock p. m. defendant met Mr. Imes, stated to him that he had just called Mrs. McKenna, and found that she was going to visit her husband at the hospital; whereupon Messrs. Imes and Piascik went to the McKenna home, entered the house, compelled Mrs. McKenna's

sister to get in bed and cover her head while Mr. Piascik guarded her. The house was then ransacked, and when Mrs. McKenna returned home about 10 p. m., as she reached the head of the stairs, the two men pointed guns at her and ordered her to open the safe which was in the upstairs cupboard. After some difficulty the safe was opened and Messrs. Imes and Piascik removed some jewelry therefrom. They procured the keys to Mrs. McKenna's automobile, told her that "if you call the police within one hour we will kill you," and taking the furs and jewelry which they had obtained they drove away in Mrs. McKenna's automobile to their apartment. There they called Mr. Mitchell and defendant, who arrived at the apartment shortly thereafter. Mr. Imes left before Mr. Mitchell and defendant arrived. Mr. Piascik, however, described to them the property which they had taken and gave each $2. On the following night defendant and Mr. Mitchell went to the same apartment and talked to Mr. Piascik about the disposition of the property which had been stolen. Four or five weeks later Mr. Piascik telephoned the defendant and told him that they were having difficulty in disposing of the furs which had been stolen, to which defendant stated that he had been so informed by Mr. Mitchell but that he believed he had someone who would buy the furs.

Defendant relies for reversal of the judgment on this proposition:

*There is no substantial corroboration of the testimony of the admitted accomplices to show defendant's participation in or connection with the crime of which he was convicted.*

This proposition is untenable. The law is established that the corroboration of the testimony of an accomplice is sufficient if the corroborating evidence tends to implicate the defendant with the commission of the offense of which he is convicted. (*People* v. *Yeager,* 194 Cal. 452, 473 [229 P. 40]; see also 8 Cal.Jur. (1922) 178, § 256.)

The following is testimony of witnesses who were not accomplices of defendant:

Mrs. McKenna testified that defendant had worked in her home for five or six years and while so employed had been treated like one of the family; that between six and seven o'clock on February 16, 1942, defendant telephoned her and asked, "What are you doing?" to which she replied, "I am going into the hospital; P. M. is very ill." (P. M. was the name by which she addressed her husband.) Defendant then

stated to her, "The reason I called you, I have been approached by a man from New York and he wants to buy your horse Sagidall," to which she stated, "Sagidall has never been for sale. I wouldn't know what to ask for him," to which defendant stated, "Oh, you ask your trainer what he is worth and if you want to sell him, this man has got a lot of money." Mrs. McKenna then asked the prospective purchaser's name, to which defendant replied, "You don't know him, he is from the east." In response to defendant's query Mrs. McKenna stated that she would be at the hospital until about nine oclock.

Mrs. McKenna did not hear from defendant, so she called him two days later, told him about the burglary, and asked him to help her. He said for her to park her car in the lot next door to the hotel in which he lived on her return from visiting her husband at the hospital and he would come out. This she did and when Mrs. McKenna asked defendant if he knew anything about the burglary he said, "No," but stated, "You came pretty near being robbed at Bay Meadows last summer," and when Mrs. McKenna said, "I did?" he replied, "Yes," and in response to her query as to who contemplated robbing her, defendant said, "A gang." Several days later Mrs. McKenna talked to defendant on the telephone and asked him if he had heard anything about the burglary and defendant said, "I could tell you plenty," to which Mrs. McKenna said, "Well, Howard (the name by which she addressed defendant), why don't you?" to which he replied, "Well, maybe I will some day."

Sam Savitsky testified that he had been in the fur business for twenty-two years and that he had known defendant for approximately eight years; that in the latter part of February, 1942, he met defendant in the Harvey Hotel and had a conversation with him, which was in substance as follows:

"A. Well, I met him in the hotel and he asked me if I had a car and I said, yes. He said, 'Where is it?' and I told him it was parked right near the hotel. He said, 'Let's go in there and talk.' So we got into my car and he wanted to know if I would be interested in buying a mink coat.

"Q. Go ahead.

"A. He said it was around a thirty-five hundred dollar or five thousand dollar mink coat and it was supposed to be a very gorgeous coat, and wanted to know if I would buy it and told me that it could be bought very cheaply.

"Q. Did he produce any coat at that time?

"A. No, sir."

He further testified that about three weeks later he had a telephone conversation as follows:

"A. I asked him if he still—if he couldn't still get that mink coat he spoke to me about. I told him I had somebody who might be interested in buying it, and he said he would find out and let me know."

A day or two later defendant called him and stated that he could get the fur coat and made an appointment to bring the coat to Mr. Savitsky's store. This appointment defendant did not keep but came in later without the coat and made another appointment. This appointment was not kept by defendant but was postponed until 5:30 p. m. the same day, at which time a Mr. Lebedeff and the witness went to the Harvey Hotel to meet defendant, where they met him in the lobby, and defendant stated that he didn't have the coat but that he would have it in a few minutes. Defendant then took the witness and Mr. Lebedeff to an apartment house on Marathon Street, a few blocks from the hotel. There he excused himself for a few minutes and returned with a black suitcase which contained a mink coat. Mr. Savitsky in the presence of defendant stated, "No, it is not the type of a fur coat I want you to have. I wouldn't let you buy it." Defendant then stated to Mr. Lebedeff, "That is strange, 'they' or 'she' paid a good deal of money for it."

Defendant then showed the witness a silver fox coat, and when the witness said he wasn't interested in buying it defendant said, "Would you pay $100 for it?" to which the witness replied no. Defendant then said, "Would you pay $75?" to which the witness replied maybe, whereupon defendant said, "Well, I will find out," and left the apartment stating he would be back in a minute. Upon his return he stated, "The boys wanted $100 or else they will throw it in the sewer." The furs were then placed in a "grip" and when the witness, Mr. Lebedeff, and defendant reached the street, defendant said, "Will you drive me back? I will be with you in a minute." He then left them and returned shortly after without the "grip."

Both of the fur coats referred to above were received in evidence, identified by the witness McKenna as two of those taken from her home and by the witness Savitsky as the coats shown to him by defendant.

The foregoing testimony in our opinion is substantial evidence to implicate defendant with the commission of the crime of which he was convicted and thus constitutes substantial corroborative evidence of the testimony of his accomplices. This testimony shows that defendant was familiar with and knew the approximate value of the furs which were stolen from Mrs. McKenna; that he subsequently had these furs in his possession and knew the value thereof, to wit, from $3,500 to $5,000; and that he was willing to dispose of the furs for a sum far less than their market value; and from the testimony it is reasonable to infer that he had a guilty knowledge that the property had been stolen, because of the manner in which he displayed it surreptitiously to a prospective customer, Mr. Savitsky. Further discussion of the evidence would serve no useful purpose.

For the foregoing reasons the judgment and order are and each is affirmed.

Moore, P. J., and Wood (W. J.), J., concurred.